UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:02-CV-626-H

JOSE LESCAILLES, ET AL.                                                                   PLAINTIFFS

V.

ANN TAYLOR DISTRIBUTION SERVICES, INC.                     DEFENDANT

**MEMORANDUM OPINION**

Plaintiffs have sued their former employer, Ann Taylor Distribution Services, Inc. ("Ann Taylor"), for violation of the Kentucky Civil Rights Act (the "KCRA") Ky. Rev. Stat. Ann. § 344.010, *et seq.*, which, among other things, prohibits employer discrimination on the basis of an individual's national origin. The KCRA can support claims based upon several types of discriminatory behavior which courts have carefully defined. This Court has previously dismissed one aspect of Plaintiffs' claim, that based upon discriminatory firing.[1] The only remaining potential claim is that Ann Taylor created a hostile work environment based upon the Cuban employees' national origin. Ann Taylor has now moved for summary judgment on that claim as well. For the reasons discussed below, the Court will sustain the motion.

I.

---

[1] Plaintiffs did not make a persuasive case that any of Defendant's conduct amounted to constructive discharge. Each Plaintiff left work for his own reasons and obtained new employment shortly thereafter. Moreover, while employed with Ann Taylor, each Plaintiff received the same pay and benefits as other similarly situated non-Cuban employees. Thus, the conduct here fell short of establishing a materially adverse change in the terms and conditions of employment necessary to support a discrimination claim. *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

Plaintiffs, Jose Lescailles, Carlos Garcia Flores, Leticia Dela Cruz Leal, Marcos Garcia, Francisco Gonzales, and Kirk Gibson, are former employees of Ann Taylor, an automated distribution center for Ann Taylor, Inc. All of them are Cuban except Gibson, who is African-American and was born in the United States.[2]

On January 7, 2002, Lescailles and Gonzalez met with Sandy Bowen, the Director of Human Resources for Ann Taylor, to discuss various work-related issues. Unbeknownst to Bowen, Lescailles and Gonzalez were speaking on behalf of the all of the plaintiffs in the action. Laura Whitlock, a Hispanic supervisor at Ann Taylor, acted as an interpreter at the meeting. Lescailles and Gonzalez complained that they were being treated differently than the American employees. Their primary concerns were that their schedules were rotated differently than the Americans. They believed that Hispanics were primarily assigned to more menial jobs with higher exertional requirements and to jobs with less help than Americans who were assigned to similar tasks. They also complained about communications problems with their lead, Robin Thompson, and their supervisor, Kurt Kissel. Specifically, on one occasion, Lescailles had asked Kissel why they had to do a particular job, and Kissel allegedly stated, "because Kurt said so." When Lescailles turned to walk away, Kissel allegedly shouted, "Don't walk away from me!"

Both parties left the meeting optimistic that the issues had been resolved and conditions would improve. The next day, Bowen met with Thompson and Kissel to review the concerns

---

[2] Gibson agreed to settle the case in March 2007, as evidenced by a handwritten and executed Mediation Agreement. The Agreement, dated March 8, 2007, states that "[a] full and formal dismissal, release etc. [sic] will be executed upon payment in about two weeks." Neither party has produced such a release, and Gibson has not been dismissed as a party to this case. Given that it appears that a settlement agreement has been signed, this judgment will not apply to Gibson. If there is argument as to the validity of his settlement, it may be made by motion.

expressed by the employees and to discuss ways to improve communication in the workplace. On January 11, 2002, Bowen met with Lescailles, Gonzales, Thompson, and Kissel, as well as Christy Gambrell, the Human Resources Assistant, and Nace Farwick, the Operations Manager. Lescailles and Gonzales again expressed their desire to be rotated among positions.

At least one other follow-up meeting was held in April 2002. According to Bowen's notes, each of the meetings ended with a sense of resolution and that the parties would work to solve the issues and improve communication. Plaintiffs now contend that after the initial meeting, their treatment worsened rather than improved and no rotation was implemented. Gonzales has testified that despite the meetings with Bowen, there had been no discernable improvement, so he stopped going to her with complaints. Lescailles was similarly frustrated with the results, and when he asked to speak with someone above Bowen was told that she would be the person to handle the matter. Sometime in early 2002, Gibson told Lescailles that he would record every instance in which an allegedly discriminatory incident occurred involving one of the Plaintiffs. The notebook contains various grievances from what appears to be October 2001 to April 2002.

It is important to set out every one of Plaintiffs' allegations of harassment in order to assess whether the severity and extent of the conduct satisfies the minimum evidentiary requirements. Plaintiffs' primary allegations are that in general, Ann Taylor targeted Cuban employees for less desirable jobs requiring greater physical exertion, that they were not rotated through other positions, and that overall they were treated more poorly than their American counterparts. For example, Lescailles testified that he was assigned to take care of three or four sorting lines himself, while Ann Taylor would staff three Americans per line. Similarly, Carlos

3

Garcia Flores testified that he was given an unreasonable number of boxes to load onto the conveyor belt.

Plaintiffs also allege a number of specific occurrences of harassment. For example, the Plaintiffs allege that Hispanic employees were served after the American employees when the company provided a dinner for employees on Valentine's Day, that two American employees who were brothers were allowed to work together while Cuban relatives were not, that Kurt Kissell banged a metal pole on the floor to tell the employees to work faster, and that on one occasion Kurt Kissell stopped Carlos Garcia Flores from using the restroom and told him to return to his work area. Jose Lescailles testified about alleged offensive comments from several Ann Taylor employees, and Marcos Garcia claims that Kurt Kissell called Lescailles "stupid", a "bastard" and told him that if he "didn't want to do the work, the door was open, he could leave." Garcia further claims that a lead named Tina told Lescailles on one occasion that Hispanic employees could not scan pallets. He also testified as to several other events that troubled him. On one occasion he was loading boxes and asked for help, and a coworker would not help him; he then complained to Kurt Kissell, and Mr. Kissell allegedly told him, "Ah, you're always complaining, you're always doing something." He also says he was not given light duty work after an illness – a claim based on an alleged doctor's note that Garcia failed to produce in response to Ann Taylor's discovery requests in this action.

Marcos Garcia further testified that he was offended by what he interpreted as racially-tinged comments in his 90-day evaluation, which read: "Marcos has made a positive impact on the presort operation during second shift. Marcos continues to provide training and leadership to the other Spanish-speaking associates. He has become an informal lead among his peers on the

shift." Garcia felt it was an unfair statement because it "separated" him from the Americans, whom he also allegedly trained.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is proper 'if...there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed.R.Civ.P. 56(c)). When deciding a motion for summary judgment, the Court must view the evidence before it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).

II.

Because the KCRA is modeled on Title VII of the Civil Rights Act of 1964, Kentucky courts interpret it to be consistent with corresponding federal anti-discrimination laws. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000); *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2006). *Also see Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 485 (6th Cir. 1989) (citing EEOC Compliance Manual). To make out a hostile work environment claim, an employee must show that (1) the employee is a member of a protected class; (2) the employee was subject to unwelcome harassment; (3) the harassment was based on the employee's protected status; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *See Vickers v. Fairfield Medical Center*, 453 F.3d 757, 762 (6th Cir. 2006).

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

5

*Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). To make out a prima facie case, Plaintiffs must satisfy both an objective and a subjective test proving (1) that the conduct was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and (2) that a plaintiff subjectively regarded the environment as abusive. *Id.* On a motion for summary judgment, this Court must search for evidence about "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether [the conduct] unreasonably interferes with an employee's work performance." *Id.* at 23. Clearly, the federal and state discrimination statutes are not intended to make actionable claims of workplace disagreements or isolated objectionable comments.

A review of many cases which discuss hostile work environment claims reveals that pervasive name-calling, threatening language, intimidating actions or insults are standard and probably required fare in every instance.[3] Thus, it is quite striking that missing from all the events alleged here is some specific evidence of language and conduct which creates a workplace "permeated with 'discriminatory intimidation, ridicule and insult.'" *Harris*, 510 U.S. at 21 (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). Plaintiffs describe none of the ethnic- or national-origin-based derogatory remarks and slurs that are so common in all other cases of this type. By contrast, the remarks alleged here are generic in character. For

---

[3] For example, *see, e.g., Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006); *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001) (discussing these issues in the context of sexual harassment); *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405 (6th Cir. 1999); *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999); *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999) (addressing a sexual harassment claim); *Jackson*, 191 F.3d 647. Even the presence of such conduct does not automatically trigger a finding of a hostile work environment. *See, e.g., Clay v. United Parcel Service*, 2007 WL 2457455 (6th Cir. 2007); *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000); *Smith*, 220 F.3d 752; *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997).

instance, use of terms such as "stupid" or even "bastard" do not contain an ethnic reference that would support a KCRA claim. To be sure, Defendant's employees' inferential language could be deemed offensive, but Plaintiffs were never threatened nor humiliated by words associated with their national origin. Even the alleged derogatory language was used on only limited occasions. Thus, the alleged conduct alone cannot be said to have created a pervasive atmosphere of hostility. In both character and quantity, Plaintiffs' allegations fall well short of the conduct that courts find in viable cases.

This Court considered a similar situation to the one presented here in *Wilson v. Dana Corp.*, 210 F.Supp.2d 867 (W.D. Ky. 2002), in which it distinguished between "repugnant conduct" and conduct that rose to the level required by the standards discussed above. Though presented with evidence of overt racial slurs directed at the plaintiffs and other acts of intimidation at the plaintiffs' workplace, this Court nonetheless granted the defendant's motion for summary judgment, having been forced to conclude based on Sixth Circuit precedent that "[b]y every measure, the circumstances alleged here do not demonstrate the severity and pervasiveness which one finds in other cases where the evidence does support a hostile work environment claim." *Id.* at 883. Factors this Court noted as being dispositive included the fact that the allegedly racist remarks were "much less hostile than the direct, intimidating, and vicious slurs present in other cases," as well as that "the persons involved in the allegedly disparate treatment are not shown to have uttered racial slurs or threats."

Here, there were essentially no hostile remarks or slurs based upon national origin. Even when viewed in the light most favorable to the Plaintiffs, Ann Taylor's alleged conduct in this case falls well below the level of severity and pervasiveness which this Court deemed

7

insufficient to create an actionable hostile work environment in *Wilson*. By their own testimony, Plaintiffs may have made the case that they were treated differently than their American counterparts. But the different treatment alone falls far short of creating a workplace "permeated with 'discriminatory intimidation, ridicule and insult,'" *Harris*, 510 U.S. at 21 (citing *Meritor*, 477 U.S. at 65), as our courts have interpreted it.

Viewed in its totality, the evidence before the Court fails to show the requisite quantum of severe, pervasive harassment directed at one's national origin needed to sustain a claim for hostile work environment discrimination.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record